*NOT FOR PUBLICATON*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

DOLGENCORP LLC,

               Petitioner,

     v.

ERIC SICA,

              Respondent.

Civil Action No. 22-cv-04269 (FLW)

OPINION

**WOLFSON, Chief Judge:**

This action arises out of discrimination, retaliation, and constructive termination claims brought by Respondent Eric Sica ("Respondent" or "Sica") in New Jersey Superior Court against Petitioner Dolgencorp LLC ("Petitioner" or "Dollar General"), among other defendants, under the New Jersey Law Against Discrimination ("LAD") following his termination by Dollar General.[1] In the instant matter, because Respondent executed an arbitration agreement before commencing employment at Dollar General, Dollar General petitions this Court to compel arbitration pursuant to the arbitration agreement under the Federal Arbitration Act, 9 U.S.C § 4. For the reasons stated below, the Court denies the petition to compel without prejudice and directs the parties to conduct limited discovery, in accordance with direction from the Magistrate Judge, on the limited issue of Sica's mental capacity to enter into an arbitration agreement.

I.       BACKGROUND AND PROCEDURAL HISTORY

---

[1] Dolgencorp is one of several defendants in the underlying state court action, *Sica v. Dolgencorp et al.*, No. OCN-L-802-22, including Dollar General Corporation ("DGC"), ABC Corporations 1-5 (together with Dollar General, "Corporate Defendants"), Sharon Betz, Brian Mankin, and John Does 1-5 (together, "Individual Defendants").

1

The relevant facts are derived from Respondent's underlying Complaint, the parties' declarations and the arbitration agreement.  Respondent, a New Jersey citizen, is a former employee of the Point Pleasant New Jersey Dollar General and was hired by the company on October 30, 2020.  Respondent alleges that Dollar General was made aware of his disabilities, including learning disabilities, hearing loss, and vision impairment resulting from a spinal meningitis diagnosis at birth, prior to the commencement of his employment, because he noted in his job application that he collects social security disability benefits and could only work a certain number of hours per week.  (State Action Compl., p. 2.)  On October 26, 2020, Respondent allegedly executed an arbitration agreement (the "Agreement") with Dollar General prior to starting his employment.  (*See* Arbitration Agreement, dated Oct. 26, 2020, ("Agreement"), Ex. A.)  Although Respondent allegedly recalls filling out certain online onboarding documents before commencing his employment, he claims that he does not recall signing the Agreement.  (*See* Eric Sica Affidavit, ("Sica Aff."), ¶ 13.)

With regard to the Agreement, which is two pages in length, the first two sentences direct the applicant to "[p]lease read this entire document carefully," and "take your time and consult with an attorney if necessary," because "[t]his is an important document that concerns legal rights." (Agreement, p. 1.)  Under these sentences, the Agreement states in pertinent part:

> Dollar General . . . has a process for resolving employment related legal disputes with employees that involves binding arbitration. This Dollar General Employee Arbitration Agreement ("Agreement") describes that process and constitutes a <u>mutually binding agreement</u> between you and Dollar General, subject to opt out rights described at the end of this Agreement. You agree that, with the exception of certain excluded claims described below, any legal claims or disputes that you may have against Dollar General, its parent and subsidiary corporations, employees, officers and directors arising out of your employment with Dollar General or termination of employment with Dollar General . . . will be addressed in the manner described in this Agreement.

(*Id*.)  The Agreement then proceeds to define arbitration and describe how employees may begin the arbitration process under the Agreement.  (*Id*.)  Under the heading "Rules and Procedures," the Agreement notes that [b]y agreeing to participate in binding arbitration, [the employee] and Dollar General acknowledge and agree to the following," including, that the employee "expressly waive[s] [his or her] right to file a lawsuit in court against Dollar General."  (*Id.* at pp. 1-2.)  The agreement also states that the employee "waive[s] [his or her] right to a jury trial."  (*Id*. at p. 2.)  Further, towards the bottom of the Agreement, it notes that the employee has the opportunity to opt out of the Agreement within 30 days of commencing employment, but will be bound by the Agreement if he or she continues to work for Dollar General.  (*Id*.)  Finally, at the bottom of the Agreement, a box is checked indicating agreement with the terms of the Agreement and Respondent's printed initials "EMS" appear next to the date October 26, 2020.  (*Id*.)

Following Respondent's termination from Dollar General, Respondent filed a complaint in the Superior Court of New Jersey, Law Division, Ocean County, against Dollar General, alleging disability discrimination, retaliation, and constructive termination in violation of the LAD. Specifically, Respondent alleges that despite informing defendant Sharon Betz of his disabilities upon commencing his employment, she allegedly told him, among other things, that he was "too slow" and "taking too long" when he restocked shelves.  (State Action Compl., p. 2.)  Further, Respondent claimed that when he submitted a formal complaint of harassment against Betz, defendant Brian Mankin took no material actions to address Respondent's complaint.  After formally complaining about Betz, Respondent alleges that Betz, in front of coworkers and customers, berated Respondent and falsely accused him of "not doing anything."  (*Id*. at p. 3.)  As a result, Respondent claimed that Dollar General constructively terminated his employment.  (*Id*.) In response to Respondent's Complaint in state court, Petitioner informed Respondent of the

3

Agreement and requested consent to stay the state court action pending arbitration. Respondent refused to consent to stay the action or submit his claims to arbitration. Thereafter, Petitioner filed the instant petition, here, to compel. (ECF No. 3.)

## II. LEGAL STANDARD

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1, *et seq.*, establishes "a strong federal policy in favor of the resolution of disputes through arbitration." *Flintkote Co. v. Aviva PLC*, 769 F.3d 215, 219 (3d Cir. 2014) (quoting *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 522 (3d Cir. 2009)). Congress passed the FAA specifically to "'reverse the longstanding judicial hostility to arbitration agreements . . . , and to place arbitration agreements upon the same footing as other contracts.'" *Teamsters Local 177 v. United Parcel Service*, 966 F.3d 245, 251 (3d Cir. 2020) (quoting *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 289 (2002)).

Section 4 of the FAA sets forth the procedure through which a court evaluates petitions to compel arbitration. That section provides, in relevant part:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement . . . . The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement . . . . If the making of the arbitration agreement... be in issue, the court shall proceed summarily to the trial thereof.

9 U.S.C. § 4. Where the issue can be decided without extrinsic evidence, courts apply the Rule 12(b)(6) standard to the face of the pleadings. However, where extrinsic evidence is necessary, courts permit discovery and decide the issue on a summary judgment standard, pursuant to Rule

56. If a genuine issue of material fact remains, summary judgment will be denied and the issues will be tried. *See Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 771 (3d Cir. 2013).

Although a party may request a jury trial when issues regarding arbitrability are "in issue," 9 U.S.C. § 4, "[a] party resisting arbitration . . . 'bears the burden of showing that he [or she] is entitled to a jury trial.'" *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 983 (2d Cir. 1996) (citing *Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 961 F.2d 1148, 1154 (5th Cir. 1992)). To that end, the party requesting a jury trial must "submit evidentiary facts showing that there is a dispute of fact to be tried." *Oppenheimer & Co., Inc. v. Neidhardt*, 56 F.3d 352, 358 (2d Cir. 1995); *see Stuart*, 85 F.3d at 983–84 (party must demonstrate a "genuine" issue); *see also Great Earth Cos., Inc. v. Simons*, 288 F.3d 878, 888–89 (6th Cir. 2002).

Before compelling arbitration, a court must determine: "(1) whether a valid agreement to arbitrate exists, and (2) whether the particular dispute falls within the scope of that agreement." *Trippe Manufacturing Co. v. Niles Audio Corp.*, 401 F.3d 529, 532 (3d Cir. 2005).

### III. DISCUSSION

Respondent opposes Dollar General's petition on three bases. First, Respondent argues that this Court does not have jurisdiction over this action. Second, Respondent argues that the motion to compel violates N.J.S.A. 10:5-12.7(a)-(b). Third, Respondent claims that the Agreement is unenforceable because he did not possess the mental capacity to enter into the Agreement. The Court addresses each argument, in turn.

#### A. The Court Has Subject Matter Jurisdiction Over the Instant Action

Contrary to Respondent's position, the Court has jurisdiction over the instant petition. Respondent argues that this Court cannot exercise jurisdiction over this case because the FAA,

alone, does not create jurisdiction, and there is no complete diversity jurisdiction. (Respondent's Br. at 3.) According to Respondent, although Petitioner is a citizen of Tennessee, complete diversity does not exist because individual defendants in the state court action, Sharon Betz and Brian Mankin, are believed to reside in New Jersey. (*Id*. at 18.) Respondent's argument, however, mistakenly focuses on the citizenship of the parties in the underlying state court action.

This matter concerns Petitioner's single claim that Respondent failed to arbitrate his claims pursuant to an arbitration agreement between Sica and Dollar General. Sica is the sole electronic signatory to the Agreement. As such, the instant dispute over the enforceability of the Agreement has no bearing on Respondent's claims against Individual Defendants in the underlying state court action. Consequently, the citizenship of Individual Defendants is irrelevant to the instant action and the Court limits its diversity analysis to the citizenship of Respondent and Petitioner. *See e.g., Golden Gate Nat. Senior Care, LLC v. Addison*, No. 14-0421, 2014 WL 4792386, at *6 (M.D. Pa. Sept. 24, 2014) (declining to "look through" the present federal action to the state action to determine the existence of diversity jurisdiction based on the parties' citizenship in the underlying dispute); *Northport Health Servs. of Arkansas, LLC v. Rutherford*, 605 F.3d 483, 490–91 (8th Cir. 2010) (concluding that diversity of citizenship is determined by the citizenship of the parties named in the proceedings before the district court); *Brookdale Sr. Living Inc. v. Stacy*, 27 F. Supp. 3d 776, 782 (E.D. Ky. 2014) (rejecting plaintiff's argument that the court must consider citizenship of defendant in underlying state action to determine diversity in the federal action); *THI of New Mexico at Hobbs Center, LLC v. Spradlin*, 893 F. Supp. 2d 1172, 1179 (D.N.M. 2012) (observing that the Supreme Court's decision in *Vaden v. Discover Bank*, which permitted courts to determine jurisdiction by "looking through" a Section 4 petition to the parties' underlying substantive

controversy is limited to Section 4 petitions based upon federal question jurisdiction); *Credit Acceptance Corp. v. Davisson*, 644 F. Supp. 2d 948, 953 (N.D. Ohio 2009) (same).[2]

While it is well-established that the FAA does not confer federal jurisdiction upon the Court, *see Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 25 n.32 (1983) ("The [FAA] is something of an anomaly in the field of federal-court jurisdiction. It creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate, yet it does not create any independent federal-question jurisdiction under 28 U.S.C. § 1331 or otherwise."), based on the foregoing jurisdiction analysis, the Court exercises jurisdiction over Petitioner's motion to compel.[3]

### B. The FAA Preempts Section 12.7 of the New Jersey Law Against Discrimination

---

[2] Respondent does not dispute that the alleged amount in controversy exceeds $75,000 or the diverse citizenship of the parties in the federal action.

[3] In addition, Respondent argues that this Court should abstain from exercising jurisdiction pursuant to *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976). Under the *Colorado River* doctrine courts are permitted to abstain from exercising jurisdiction by staying or dismissing a pending federal action in favor of a parallel state court proceeding where (1) the state and federal court proceedings are indeed "parallel," and (2) "extraordinary circumstances" warrant abstention under six factors. *Nationwide Mut. Fire Ins. Co. v. George V. Hamilton, Inc.*, 571 F.3d 299, 307–08 (3d Cir. 2009) (citations omitted).

Proceedings are "parallel" if they "involve the same parties and substantially identical claims, raising nearly identical allegations and issues." *Yang v. Tsui*, 416 F.3d 199, 204 n.5 (3d Cir. 2005) (internal quotation marks omitted) (quoting *Timoney v. Upper Merion Twp.*, 66 F. App'x 403, 405 (3d Cir. 2003)). In addition to asking whether the actions involve the same parties and issues, courts ask whether the actions seek the same remedy. *See GGNSC Lancaster v. Roberts*, 13-5291, 2014 WL 1281130, at *3 (E.D. Pa. Mar. 31, 2014) (citing *Allied Nut and Bolt, Inc. v. NSS Industries, Inc.*, 920 F. Supp. 626, 630–31 (E.D. Pa. 1996)).

Here, although the parties in the federal action are also parties in the state action, the issues and remedies sought are not the same. Indeed, in the underlying state action Respondent seeks monetary damages for alleged discrimination and retaliation, whereas the instant issue in the federal case concerns the appropriate forum for Respondent's claims to be heard given the execution of an arbitration agreement. Thus, the Court finds that the proceedings are not parallel. Because the proceedings are not parallel, the Court need not address the exceptional circumstances factors.

Next, Respondent argues that N.J.S.A. 10:5-12.7 (Section 12.7) bars enforcement of the Agreement. Section 12.7 of the LAD precludes the waiver of "any substantive or procedural right or remedy," including "the right to file a complaint in the Superior Court to be heard before a jury." §§ 10:5-13(a)(1)–(2). Petitioner responds that Section 12.7 is preempted by the FAA. I agree.

Because the FAA is a federal statute, any state law that conflicts with it or frustrates its purpose violates the Supremacy Clause. *See* U.S. Const. art. VI, cl. 2; *Southland Corp. v. Keating*, 465 U.S. 1, 10 (1984); *see also AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 347 n.6 (2011) ("States remain free to take steps addressing the concerns that attend contracts of adhesion ... [s]uch steps cannot, however, conflict with the FAA or frustrate its purpose to ensure that private arbitration agreements are enforced according to their terms.").

Section 2 of the FAA "foreclose[s] state legislative attempts to undercut the enforceability of arbitration agreements." *Preston v. Ferrer*, 552 U.S. 346, 353 (2008). Section 2 provides the following saving clause:

> [a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. The provision's saving clause, which recognizes "only defenses that apply to 'any' contract," *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1622 (2018), requires courts to "place arbitration agreements on an equal footing with other contracts, and enforce them according to their terms." *Concepcion*, 563 U.S. at 339 (citations omitted). Thus, a state law that "singl[es] out arbitration provisions for suspect status . . . directly conflicts with § 2 of the FAA." *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996).

8

Although Section 12.7 of the LAD does not single out arbitration by name, by prohibiting the waiver of "any substantive or procedural right or remedy," N.J. Stat. Ann § 10:5-12.7, including "the right to file a complaint in the Superior Court to be heard before a jury," §§ 10:5-13(a)(1)–(2), this Court has already held that Section 12.7, in effect, "singles out arbitration agreements for disfavored treatment," and is thus preempted by the FAA. *New Jersey Civ. Just. Inst. v. Grewal*, No. 19-17518, 2021 WL 1138144, at *7 (D.N.J. Mar. 25, 2021) (quoting *Kindred Nursing Ctrs. Ltd. P'shp v. Clark*, 137. S. Ct. 1421, 1425–26 (2017)).

Although Respondent cites *Powell v. Prime Comms Retail, LLC*, No. 999-21 (Law Div. Oct. 22, 2021), a recent Law Division opinion in which the court described the issue of FAA preemption as "unsettled," several New Jersey Appellate Division cases have also held that the FAA preempts Section 12.7. *See Cangiano v. Doherty Grp., Inc.*, No. 3082-19, 2022 WL 1052214, at *5 (N.J. Super. Ct. App. Div. Apr. 8, 2022) (concluding that the FAA preempts NJ.S.A. 10:5-12.7); *Antonucci v. Curvature Newco, Inc.*, 470 N.J. Super. 553, 566 (App. Div. 2022) ("FAA pre-empts Section 12.7 when applied to prevent arbitration called for in an agreement governed by the FAA"); *Salters v. Brinker Int'l, Inc.*, 2022 WL 729801, at *1 (N.J. Super. Ct. App. Div. March 11, 2022) (holding that the FAA preempts Section 12.7 and affirming portion of order compelling LAD claims to arbitration); *Aguirre v. Conduent Patient Access Sols., LLC*, 2022 WL 893636, at *4 (N.J. Super. Ct. App. Div. Mar. 28, 2022) (same). Since Respondent has not convinced me why I should deviate from my prior decision in *Grewal*, consistent with that decision and others like it, I find that the FAA preempts Section 12.7 of the LAD.

### C. Additional Discovery is Necessary to Evaluate Respondent's Mental Capacity

Respondent argues that he did not knowingly and voluntarily waive his right to sue in court, because the language of the Agreement is too ambiguous to constitute a "clear and unmistakable"

9

waiver of his right to sue, and he lacked the mental capacity to enter into a legally binding contract due to his neurological disorder and disabilities. (Respondent Br. at 14-18.) As stated above, Respondent was diagnosed with spinal meningitis at birth, and as a result, has since been diagnosed with learning disabilities, hearing loss, vision impairment, memory loss, lack of concentration, difficulty retaining information, coordination problems, loss of balance, headaches, muscle spasms, and speech issues. (Sica Aff. ¶ 4.) Although Respondent has submitted medical records that support his diagnoses, they are insufficient for the Court to properly evaluate his mental capacity to enter into the Agreement in October 2020.

Before compelling arbitration, courts must be satisfied that the parties have an agreement to arbitrate, because "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (internal quotations and citations omitted); *see also Atalese v. U.S. Legal Servs. Grp., L.P.*, 219 N.J. 430, 443 (N.J. 2014) ("[A]ny contractual waiver-of-rights provision must reflect that [the party] has agreed clearly and unambiguously to its terms.") (internal quotations and citation omitted) (alterations in original). Courts look to state law principles to determine whether parties have agreed to arbitrate. *Aliments Krispy Kernels, Inc. v. Nichols Farms*, 851 F.3d 283, 289 (3d Cir. 2017). Under New Jersey law principles, "[a]n agreement to arbitrate, like any other contract, must be the product of mutual assent, as determined under customary principles of contract law." *James v. Glob. TelLink Corp.*, 852 F.3d 262, 265 (3d Cir. 2017) (quoting *Atalese*, 219 N.J. at 442). There must be a "meeting of the minds." *NAACP of Camden County v. Foulke Mgmt.*, 421 N.J. Super. 404, 425 (App. Div. 2011). "[I]f parties agree on essential terms and manifest an intention to be bound by those terms, they have created an

enforceable contract." *Crawford v. Compass Grp. USA*, No. 14-2545, 2015 WL 1006389, at *3 (D.N.J. Mar. 6, 2015) (citation omitted).

As a preliminary matter, the language of the Agreement is clear and unambiguous. It provides in bold font that "Dollar General . . . has a process for resolving employment related legal disputes with employees that involves binding arbitration." (Agreement, p. 1.) Further, it states below that "[b]y agreeing to participate in binding arbitration, [Respondent] and Dollar General acknowledge and agree to the following[,]" including that Respondent "expressly waive[s] [his] right to file a lawsuit in court against Dollar General asserting any Covered Claims" and that Respondent "waive[s] [his] right to a jury trial." (*Id*. at 2.) The Agreement also defines "Covered Claims" as those "relating to or arising out of [Respondent's] employment or termination of employment with Dollar General . . . includ[ing], but [] not limited to, claims alleging violations of wage and hour laws, *state and federal laws prohibiting discrimination, harassment, and retaliation*, claims for defamation or violation of confidentiality obligations, claims for wrongful termination, tort claims, and claims alleging violation of any other state or federal laws, except claims that are prohibited by law from being decided in arbitration, and those claims specifically excluded in the paragraph below." (*Id*. at 1.) (emphasis added). Respondent's argument that the Agreement does not satisfy the New Jersey Supreme Court's language in *Alamo Rent a Car, Inc. v. Galarza*, is misplaced. There, the Court declined to compel arbitration of the plaintiff's LAD claim against rental car company, Alamo, because it found that the arbitration clause in the plaintiff's employment agreement with Alamo was insufficiently inclusive. *Alamo Rent a Car, Inc.*, 306 N.J. Super. 384, 388, 394–95 (App. Div. 1997). In so finding, the Court instructed that while inclusion of broad language indicating that arbitration applies to "any dispute" arising out of employment is the very least required of an employer to guarantee arbitration of all disputes,

"the better course would be the use of language reflecting that the employee, in fact knows that other options such as federal and state administrative remedies and judicial remedies exist; that the employee also knows that by signing the contract, those remedies are forever precluded; and that, regardless of the nature of the employee's complaint, he or she knows that it can only be resolved by arbitration." *Id*. at 394.  Although the Court suggested a "better course" of language, it did not mandate the inclusion of language in arbitration agreements that judicial remedies are "forever precluded," as Respondent suggests.  Rather, a valid and enforceable arbitration clause need only, "at least in some general and sufficiently broad way, . . . explain that the plaintiff is giving up her right to bring her claims in court or have a jury resolve the dispute." *Atalese*, 219 N.J. at 447.  Because I find that the language in the Agreement is sufficient to meet the *Alamo* standard, I reject Respondent's argument in this context.

Next, Respondent argues that notwithstanding the language of the Agreement, his mental disabilities precluded him from knowingly and voluntarily waving his right to commence a lawsuit in state court.  Specifically, Respondent claims that he did not recall signing the Agreement,[4] and that even after reviewing the Agreement with his counsel, he still "find[s] the Arbitration

---

[4] Although Respondent does not recall signing the Agreement, he does not dispute that his initials appear on the Agreement.  As such, whether Respondent recalls signing the agreement is immaterial, as he is presumed to have read and understood the Agreement upon indicating his agreement with the terms with his initials. *See Raiczyk v. Ocean County Veterinary Hospital*, 377 F.3d 266, 270 (3d Cir. 2004) ("signing a contract creates a conclusive presumption that the signer read, understood, and assented to its terms") (internal quotations and citation omitted); *Liptak v. Accelerated Inventory Mgmt., LLC*, No. 2:20-967, 2021 WL 650514, at *2 (W.D. Pa. Feb. 19, 2021) (rejecting Plaintiff's argument that he should not be bound to an arbitration agreement because he allegedly did not remember reading the agreement or assenting to arbitration when he selected a button indicating that he was in agreement with the agreement's terms on the webpage); *Baig v. Nuclear Regul. Comm'n*, No. 10-0842, 2013 WL 1558707, at *3 (D.N.J. Apr. 10, 2013) (noting that failure to read a contract is not a defense to being bound by the terms of a contract).

Agreement confusing and difficult to understand" because he "always [has] a hard time understanding when [he has] to read long documents." (Sica Aff. ¶¶ 13, 15.)

The test for mental capacity in New Jersey is whether:

> [A] man [or woman] [has] the ability to understand the nature and effect of the act in which he [or she] is engaged, and the business he [or she] is transacting.... [I]f the mind be so clouded or perverted by age, disease, or affliction, that he [or she] cannot comprehend the business in which he [or she] is engaging, then the writing is not his [or her] deed.

*Wolkoff v. Villane*, 288 N.J. Super. 282, 287 (App. Div. 1996) (fifth alteration in original) (quoting *Eaton v. Eaton*, 37 N.J.L. 108, 113 (1874)).  Importantly, "[w]here there is not the mental capacity to comprehend and understand, there is not the capacity to make a valid contract." *Id*. (internal quotation marks and citation omitted).  In this regard, the party seeking to challenge the enforceability of an arbitration agreement, bears the burden of proving his incapacity or incompetence to contract by clear and convincing evidence.  *S.T. v. 1515 Broad St., LLC*, 241 N.J. 257, 281 (2020); *see also Jennings v. Reed*, 381 N.J. Super. 217, 227 (App. Div. 2005).

Here, Respondent, now approximately age 38, produced earlier medical records and Individualized Educational Program records, including educational plans, evaluations and psychological testing reports.  In high school, Respondent's educational program included in class support academics with mainstreaming in regular elective areas including industrial arts and Spanish.  (*See* Interpretive Report of WISC-III Testing, January 3, 2001, Ex. K.)  Psychological testing at age 16 revealed general cognitive ability (FSIQ = 60), as estimated by the WISC-III, in the "intellectually deficient" range.  (*Id*.)  However, the school psychologist noted that the overall score appeared to be an underestimation of Respondent's potential in regards to actual classroom performance.  (*Id*.)  Notably, IEP records describe Respondent's reading capability as "average"

13

relative to other students at his age level.  (*See* Rationale For Eligibility Form, p. 2., Ex. K.) Further, Respondent was noted to have demonstrated a significant intra-achievement strength in broad reading and a significant intra-achievement weakness in broad mathematics. (*Id*.) Another IEP record reports that despite the negative impact Respondent's inconsistent and neurodevelopmental delays have had on his academics, previous testing and classroom performance reveal relative strengths in word attack and reading comprehension, especially relative to basic math computation.  (*See* Classification Eligibility for Special Education and Related Services Summary, p. 1., Ex. K.)

Plaintiff most recently underwent cognitive and personality testing in August 2012, at the age of 28.  (*See* Neuropsychology Report, dated August 23, 2012, Ex. L.)  Theodore J. Batlas, Psy.D. administered several tests, including the Weschler Adult Intelligence Scale-IV and Weschler Memory Scale-III, among others.  (*Id*.)  Mr. Batlas reported that Respondent's overall general/cognitive intellectual functioning was found to be in the "borderline range" (WAIS-IV Full Scale IQ = 73).  Regarding academic skills, "a measure of oral word reading yielded a score consistent with the post-high school grade level, while written word spelling was consistent with the high school grade level."  (*Id*. at p.3.)  Overall, Mr. Batlas indicated that cognitive testing revealed "significant impairments on measures of processing speed, complex visual processing problem-solving abilities, and sustained attention," in addition to "[r]elatively more mild levels of impairment . . . on other tests of visual perceptual reasoning, fluency ability, and both verbal and visual memory abilities."  (*Id*.)

The evidence submitted to the Court is inconclusive as to whether Respondent's disability precluded him from "understand[ing] the nature and effect" of entering into an arbitration agreement or that Respondent's mind was "so clouded" that he could not comprehend the

Agreement. *Wolkoff*, 288 N.J. Super. at 287. Although the evidence does appear to support Respondent's alleged learning disabilities, including impaired concentration and memory loss, it does not appear to conclusively support a level of weakness in reading comprehension such that Respondent could not comprehend a two-page arbitration agreement.[5] Another concern the Court has is the dated nature of the medical records. There is no recent evidence, such as an expert report, that the Court can rely on to evaluate Respondent's mental capacity. Respondent's disability may have worsened over time due to the nature of his diagnoses. However, I note that a recent action Respondent brought against Panera Bread in state court suggests that Respondent may have had some understanding of the meaning and significance of an arbitration agreement in October 2020, when he executed the Agreement. Indeed, in January 2019, more than a year and a half prior to Respondent being employed by Dollar General and signing the Agreement, Respondent filed a separate action in New Jersey Superior Court, Monmouth County, against Panera Bread alleging discrimination and retaliation on the basis of disability. *See Sica Eric v. Panera Bread d/b/a American*, No. MON-L-000324-19 (Law Div. Jan. 24 2019). In that case, Panera Bread filed a motion to dismiss in which it argued that that Respondent's claims were subject to arbitration pursuant to an arbitration agreement Respondent had entered into with Panera. Notably, Respondent submitted a handwritten certification on March 31, 2019 with his opposition papers in which he stated that he "had no idea what an arbitration agreement even was, [and] if [he] did, [he] wouldn't of understood it anyway." (Cert. of Wayne E. Pinkstone, Ex. D.) Additionally, he noted that he "would never [sic] agreed to the arbitration agreement with Panera[,] [and] [a]t the very least [he] would have asked an attorney or family member to review the agreement

---

[5] If the Court had to determine Respondent's mental capacity to enter into an arbitration agreement based on the current record, it cannot find that Respondent has met his burden of proving by clear and convincing evidence that he, in fact, lacked the mental capacity to enter into the Agreement.

with [him] so [he] could of understood what [he] was signing because arbitration agreements limit legal rights." (*Id*.) Consequently, it appears that from March 2019, onward, Respondent would have understood at a minimum that "arbitration agreements limit legal rights." (*Id*.)[6]

Nonetheless, although the evidence submitted does not constitute clear and convincing evidence of incapacity or incompetence to enter into an arbitration agreement, given the lack of recent psychological testing, the Court will permit the parties to conduct discovery on the limited issue of Respondent's mental capacity to knowingly and voluntary enter into an arbitration agreement given his learning disabilities. In other words, discovery is permitted on the discrete issue of whether Respondent's learning disabilities precluded him from "understand[ing] the nature and effect" of an arbitration agreement and whether his learning disabilities are so severe as to prevent him from reasonably "comprehend[ing] the [arbitration agreement] [] which he [executes]." *Wolkoff*, 288 N.J. Super. at 287. As a result, the Court will defer its determination of whether Respondent was mentally capable of agreeing to submit employment related claims, including discrimination claims, to arbitration pending discovery.[7]

## IV.    CONCLUSION

For the foregoing reasons, Dollar General's petition to compel arbitration is **DENIED** without prejudice. The parties are directed to communicate with the Magistrate Judge regarding the procedure and duration for the limited discovery on the issue of Respondent's mental capacity to enter into an arbitration agreement.

---

[6]    The Court is unaware whether the state court granted Panera Bread's motion to dismiss. Regardless of the outcome in *Panera Bread*, however, it appears that Respondent may have understood the significance of an arbitration agreement at the time he entered into the Agreement with Dollar General.

[7]    The parties should consider retaining expert(s) to opine on this issue, which would be most effective.

16

**DATED**: September 13, 2022

<u>/s/ Freda L. Wolfson</u>
Hon. Freda L. Wolfson
U.S. Chief District Judge