**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| DOLGENCORP LLC,<br><br>                Petitioner,<br><br>v.<br><br>ERIC SICA,<br><br>                Respondent. | Civil Action No. 22-04269 (GC) (JBD)<br><br>**OPINION** |

**CASTNER, U.S.D.J.**

      **THIS MATTER** comes before the Court upon Dolgencorp LLC's Petition to Compel Arbitration of Respondent Eric Sica's employment-related claims for discrimination, retaliation, and constructive termination asserted in the Superior Court of New Jersey. (ECF No. 3.) Following limited discovery, Petitioner filed a brief and exhibits in support, and Respondent filed a brief and exhibits in opposition. (ECF Nos. 43 & 45.) Having carefully reviewed and considered the parties' submissions pursuant to 9 U.S.C. § 4, the Court **GRANTS** the petition.

**I.    BACKGROUND**

      Petitioner Dolgencorp LLC filed its petition to compel arbitration pursuant to Section 4 of the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-4.[1] (ECF No. 3.) Petitioner asks the Court to compel arbitration of Respondent Eric Sica's employment-related claims for discrimination, retaliation, and constructive termination under the New Jersey Law Against Discrimination

---

[1] Petitioner based subject-matter jurisdiction on diversity jurisdiction pursuant to 28 U.S.C. § 1332. (ECF No. 3 ¶ 3.)

("NJLAD"), filed on April 14, 2022, in the Superior Court of New Jersey, Law Division, Ocean County, Docket No. OCN-L-802-22.[2] (*Id.* ¶¶ 11-13.)

Upon receipt of the petition, the Court set a briefing schedule. (ECF No. 5.) Respondent opposed on August 8, 2022, and Petitioner replied on August 15. (ECF Nos. 6-7.)

On September 13, 2022, the Court issued its Opinion and accompanying Order denying the petition to compel arbitration without prejudice.[3] (ECF Nos. 10-11.) The Court addressed three objections raised by Respondent. *First*, the Court found that it has subject-matter jurisdiction over the petition. (ECF No. 10 at 5-6.[4]) The Court explained that the parties to this petition are diverse and the citizenship of individual defendants in the underlying state-court action is not relevant to whether Petitioner may petition a federal court to compel Respondent's claims to arbitration in accordance with the FAA. (*Id.* at 6-7 (collecting cases).) *Second*, the Court found that the NJLAD claims could be compelled to arbitration because the FAA preempts the provision in the state statute that precludes the waiver of "the right to file a complaint in the Superior Court to be heard before a jury." (*Id.* at 7-9 (quoting N.J. Stat. Ann. § 10:5-13(a)(1)-(2)).) And *third*, the Court found that the arbitration agreement's terms were enforceable but additional discovery was needed to evaluate Respondent's argument that "he lacked the mental capacity to enter into a legally binding contract due to his neurological disorder and disabilities." (*Id.* at 9-10.) The Court explained that "[a]lthough Respondent ha[d] submitted medical records that support his diagnoses, they [were] insufficient . . . to properly evaluate his mental capacity to enter into the [Arbitration]

---

[2]   Dollar General is Respondent's former employer and the sole member of Dolgencorp, LLC. (ECF No. 3 ¶¶ 1, 5.)

[3]   The Court presumes the reader's familiarity with the factual background provided in its earlier Opinion. (*See* ECF No. 10.)

[4]   Page numbers for record cites (*i.e.*, "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

Agreement in October 2020." (*Id.* at 10.) Thus, the Court allowed the parties "to conduct discovery on the limited issue of Respondent's mental capacity to knowingly and voluntar[ily] enter into an arbitration agreement given his learning disabilities." (*Id.* at 16.)

On September 23, 2022, Petitioner filed a letter that asked the Court to stay the state-court action pending a decision on the petition to compel. (ECF No. 13.) The Court denied the request on September 26, advising Petitioner that until the Court decided whether the claims should be compelled to arbitration, the appropriate forum to seek a stay was in state court. (ECF No. 14.)

In October 2022, the Magistrate Judge issued an order setting the limited discovery schedule. (ECF No. 19.) The parties filed a stipulation in January 2023 to extend the discovery schedule, which the Court granted. (ECF No. 25.)

On February 21, 2023, Petitioner moved to compel Respondent to participate in an independent medical examination without a third-party present for the examination. (ECF No. 26.) Respondent opposed and cross-moved for a protective order on March 6. (ECF No. 29.) On June 26, the Court granted Petitioner's motion and directed that the examination take place without a third-party observer. (ECF No. 37.) The Court was "persuaded in this case that a third-party observer [was] likely to be detrimental to the integrity of . . . [the examination], potentially rendering any resulting expert opinion inaccurate" or the examination "more adversarial rather than less." (*Id.* at 6-7.)

Following the close of discovery, Petitioner filed a supplemental brief and exhibits in support of compelling arbitration. (ECF No. 43.) Respondent filed a supplemental brief and exhibits in opposition. (ECF No. 45.)

## II.   LEGAL STANDARD

The Federal Arbitration Act "establishes a strong federal policy in favor of compelling arbitration over litigation." *MZM Constr. Co., Inc. v. New Jersey Bldg. Laborers Statewide Benefit*

*Funds*, 974 F.3d 386, 396 (3d Cir. 2020) (quoting *Sandvik AB v. Advent Int'l Corp.*, 220 F.3d 99, 104 (3d Cir. 2000)). Under the FAA, "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue," a district court must "make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4. If the making of the arbitration agreement is at issue and cannot be decided as a matter of law, "the court shall proceed summarily to the trial thereof." *Id.* If there is no demand for a jury trial "on or before the return day of the notice of application," then "the court shall hear and determine such issue." *Id.* The aim of the procedure is to "ensur[e] that arbitration is awarded only if there is 'an express unequivocal agreement to that effect.'" *Guidotti v. Legal Helpers Debt Resol., L.L.C.*, 716 F.3d 764, 775 (3d Cir. 2013) (quoting *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 (3d Cir. 1980)); *accord Sapp v. Indus. Action Servs., LLC*, 75 F.4th 205, 208 (3d Cir. 2023) ("Arbitration is an ever-growing trend that many parties prefer and courts routinely enforce. Yet that trend cannot continue so far that arbitration is forced on parties who never agreed to it.").

When evaluating a petition to compel arbitration, courts must treat "agreements to arbitrate . . . like 'all other contracts,'" and "'ordinary state-law principles' governing contract formation" ordinarily apply. *MZM Constr. Co., Inc.*, 974 F.3d at 402 (citations omitted); *see also Hojnowski v. Vans Skate Park*, 901 A.2d 381, 392 (N.J. 2006) ("Although the FAA applies to both state and federal judicial proceedings, state contract-law principles generally govern a determination whether a valid agreement to arbitrate exists.").

4

Under New Jersey law,[5] "[a]n agreement to arbitrate, like any other contract, must be the product of mutual assent, as determined under customary principles of contract law." *MZM Constr. Co., Inc.*, 974 F.3d at 402 (quoting *James v. Glob. TelLink Corp*, 852 F.3d 262, 265 (3d Cir. 2017)); *Fawzy v. Fawzy*, 973 A.2d 347, 354 (N.J. 2009) ("[B]inding arbitration cannot be imposed by judicial fiat."). Nevertheless, "[i]t is the general rule that where a party affixes [her] signature to a written instrument, . . . a conclusive presumption arises that [she] read, understood and assented to its terms and [she] will not be heard to complain that [she] did not comprehend the effect of [her] act in signing." *MZM Constr. Co., Inc.*, 974 F.3d at 403 (quoting *Peter W. Kero, Inc. v. Terminal Const. Corp.*, 78 A.2d 814, 817 (N.J. 1951)).

## III.   DISCUSSION

The Court previously concluded that the Dollar General Employee Arbitration Agreement, which Respondent electronically signed in October 2020, "is clear and unambiguous." (ECF No. 10 at 11.) The agreement states that Respondent agreed to participate in binding arbitration and expressly waived his right to file a lawsuit in court asserting claims relating to or arising out of Respondent's employment with Dollar General, including "claims alleging violations of . . . state and federal laws prohibiting discrimination, harassment, and retaliation." (*Id.* (emphasis removed).) Thus, the only remaining dispute is Respondent's contention that he lacked the mental capacity to enter into the agreement due to his neurological disabilities.

Where, as here, a defense to an application to compel arbitration rests on the claim that one party did not have the mental capacity to enter into the agreement, courts typically hold that this is an issue under Section 4 of the FAA for a court to decide. *See Hampton v. ADT, LLC*, A-0172-

---

[5]   Both parties cite New Jersey law and there appears to be no dispute that New Jersey law applies in this diversity action stemming from Respondent's employment at Dollar General in New Jersey. *See Argabright v. Rheem Mfg. Co.*, 201 F. Supp. 3d 578, 591 n.5 (D.N.J. 2016).

20, 2021 WL 1713295, at *5 (N.J. Super. Ct. App. Div. Apr. 30, 2021) ("Consistent with these principles, a trial court should decide a dispute as to whether a party assented to the terms of an arbitration contract, including a provision delegating disputes over arbitrability to the arbitrator."); *Hall v. Healthsouth Rehab. Hosp. of Vineland*, A-2453-12, 2013 WL 3581263, at *7 (N.J. Super. Ct. App. Div. July 16, 2013) (same); *see also Sandvik AB v. Advent Int'l Corp.*, 220 F.3d 99, 107 (3d Cir. 2000) ("Because under . . . the FAA a court must decide whether an agreement to arbitrate exists before it may order arbitration, the District Court was correct in determining that it must decide whether Huep's signature bound Advent before it could order arbitration.").[6]

Under New Jersey law, "the longstanding rule is that 'where there is not the mental capacity to comprehend and understand, there is not the capacity to make a valid contract.'" *Jennings v. Reed*, 885 A.2d 482, 488 (N.J. Super. Ct. App. Div. 2005) (quoting *Wolkoff v. Villane*, 672 A.2d 242, 244 (N.J. Super. Ct. App. Div. 1996)). A party to a contract must "have the ability to understand the nature and effect of the act" as well as the business being transacted, and "[i]f the mind [is] so clouded or perverted by age, disease, or affliction, that [a party] cannot comprehend

---

[6] *See also Sanders v. Savannah Highway Auto. Co.*, 892 S.E.2d 112, 118 (S.C. 2023), *reh'g denied* (Sept. 27, 2023) ("[A]rbitration is a matter of consent, and courts can only order arbitration when they are satisfied the parties agreed to arbitrate a dispute. Accordingly, the court is always the proper body to determine whether the parties agreed to arbitrate in the first instance." (citations omitted)); *TitleMax of Alabama, Inc. v. Falligant as next friend of McElroy*, 328 So. 3d 244, 251 n.2 (Ala. 2020) ("[T]here is authority for concluding that the circuit court, and not an arbitration proceeding, is the appropriate forum for determining whether McElroy had the mental capacity to contract with TitleMax."); *Spahr v. Secco*, 330 F.3d 1266, 1273 (10th Cir. 2003) ("Spahr's mental incapacity defense naturally goes to *both* the entire contract and the specific agreement to arbitrate in the contract. Therefore, Spahr's claim that he lacked the mental capacity to enter into an enforceable contract placed the 'making' of an agreement to arbitrate at issue under § 4 of the FAA."); *Mayorga v. Ronaldo*, 491 F. Supp. 3d 840, 854 (D. Nev. 2020) ("[I]n light of the Supreme Court's signal in its *Buckeye* dicta that a signor's mental capacity to assent raises a question of contract formation and its *Granite Rock* holding that such matters are generally for the court to decide, I adopt the *Spahr* court's rationale and likewise conclude that Mayorga's mental-incapacity challenge must be determined by the court . . . .").

the business in which he [or she] is engaging, then the writing is not his [or her] deed." *Id.* (quoting *Eaton v. Eaton*, 37 N.J.L. 108, 113 (Sup. Ct. 1874)).

The party seeking to set aside an "agreement has the burden of proving his [or her] incapacity or incompetence to contract or other extraordinary circumstance sufficient to vitiate the agreement." *Id.*; *accord RLI Ins. Co. v. Vintage Contracting Co.*, Civ. No. 07-5006, 2010 WL 4063396, at *2 (D.N.J. Oct. 15, 2010) ("A party seeking to set aside a settlement agreement has the burden of proving incapacity or incompetence to form a valid contract or other extraordinary circumstance."). And New Jersey's courts have directed that the finding of incapacitation should be based on "clear and convincing evidence." *See Jackson-Billie v. Virtua Mem'l Hosp. Burlington Cnty., Inc.*, A-0418-19, 2020 WL 1983054, at *1 (N.J. Super. Ct. App. Div. Apr. 27, 2020) ("Incapacitation is a defense in contract law, and plaintiffs have the burden of demonstrating that . . . by clear and convincing evidence."); *McDermott v. Genesis Healthcare*, A-3585-17, 2019 WL 3282925, at *1 (N.J. Super. Ct. App. Div. July 22, 2019) ("Her ability to enter into an arbitration agreement . . . is disputed. Plaintiff has the burden of demonstrating by clear and convincing evidence that she was incapacitated."); *see also Nolan by Nolan v. Lee Ho*, 577 A.2d 143, 146 (N.J. 1990) ("Before vacating a settlement agreement, our courts require 'clear and convincing proof' that the agreement should be vacated."); *Liberty Mut. Ins. Co. v. Land*, 892 A.2d 1240, 1244 (N.J. 2006) ("The clear and convincing standard 'should produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" (citation omitted)).

Here, the parties dispute whether the evidence demonstrates that Respondent, who is approximately forty years old, knowingly and voluntarily entered into the arbitration agreement with Dollar General in October 2020. Respondent contends that the limited discovery has confirmed that he did not have the mental capacity to enter into a binding arbitration agreement.

He underscores that although he graduated from high school and attended college for a short period of time, he has suffered from spinal meningitis since birth, receives state disability benefits, was diagnosed with learning disabilities from a young age and was provided an individualized educational program ("IEP"). Petitioner strongly disagrees, contending that nothing produced during the limited discovery period supports Respondent's claim that he was mentally incapable of agreeing to arbitration in the fall of 2020. Petitioner argues that the evidence clearly shows that Respondent understood the nature and effect of signing the arbitration agreement at issue.

Having carefully reviewed the parties' arguments and the evidence offered, the Court finds that, as a matter of law, Respondent has not presented clear-and-convincing evidence that proves that he was mentally incapacitated or incompetent when he agreed to the Dollar General Employee Arbitration Agreement in October 2020.[7]

The Court's prior Opinion examined Respondent's medical and individual educational program records, including educational plans, evaluations, and psychological testing reports. (ECF No. 10 at 13.) The Court noted that Respondent's educational program in high school consisted of class support academics with mainstreaming in regular elective areas. (*Id.*) Although psychological testing when Respondent was sixteen years old revealed a general cognitive ability in the "intellectually deficient" range, IEP records described Respondent's reading capability as "average" relative to other students at his age level, and Respondent demonstrated significant intra-achievement strength in broad reading and significant intra-achievement weakness in broad mathematics. (*Id.* at 13-14.) And in August 2012, at age twenty-eight, Respondent underwent cognitive and personality testing with Theodore Batlas, Psy.D. (*Id.* at 14.) Dr. Batlas opined that,

---

[7] Neither party has requested that the Court conduct a hearing or hold a jury trial on the issue of Respondent's mental competence, and the Court does not find that a hearing is necessary in this case. *See* 9 U.S.C. § 4.

among other things, Respondent's overall general/cognitive intellectual functioning was in the "borderline range." (*Id.* at 14.) Dr. Batlas also opined that while Respondent had significant impairments on measures of processing speed and complex visual processing, Respondent had relatively more mild levels of impairment on tests of visual perceptual reasoning and fluency ability. (*Id.*)

The Court found this older evidence "inconclusive" as to whether Respondent's disability precluded him from understanding the nature and effect of signing the arbitration agreement in October 2020. (*Id.* at 14-15.) The Court explained that the evidence did "not appear to conclusively support a level of weakness in reading comprehension such that Respondent could not comprehend a two-page arbitration agreement." (*Id.* at 15.) "If the Court had to determine Respondent's mental capacity to enter into an arbitration agreement based on the . . . record [at that time], it [could not] find that Respondent ha[d] met his burden of proving by clear and convincing evidence that he, in fact, lacked the mental capacity to enter into the Agreement." (*Id.* at 15 n.5.) Rather than rush to a decision, however, the Court granted the parties an opportunity to conduct limited discovery to obtain more recent evidence and to show whether "Respondent's disability may have worsened over time due to the nature of his diagnoses." (*Id.* at 15-16.)

The primary new evidence offered by the parties is the deposition testimony of Respondent, expert report of George Carnevale, Ph.D., and expert report of Joel Morgan, M.D.

In Respondent's deposition, he testified that after he graduated high school, he attended Ocean County College for less than a year; has certifications in first aid, CPR, and Microsoft Office; and has designed web pages for businesses, including coding the sites. (ECF No. 45-1 at 64-66, 105-06.) Respondent also testified that he did not understand what arbitration was when he agreed to the Dollar General arbitration agreement, but he confirmed that he understood certain aspects of the agreement and that it would affect his legal rights. (*Id.* at 99-102.)

9

In Dr. Carnevale's seven-page report,[8] solicited by Respondent, Dr. Carnevale notes that he administered a series of cognitive tests as well as a chart review and clinical interview. (ECF No. 45-1 at 32-33.) Dr. Carevale found that Respondent "was oriented to personal and current event information"; "[b]asic expressive and receptive language skills were intact," with Respondent's "writing sample" being "grossly intact for spelling, grammar, and graphomotor control"; "immediate auditory attention and concentration" was "in the borderline impairment range"; "measure of immediate visual attention and memory . . . was average"; "visuomotor speed and attention" was "below the 5%$^{tile}$ for age" and the Trail Making test for executive function was "discontinued due to frustration"; Respondent showed "difficulty with auditory processing of moderately complex or lengthy information"; and Respondent's vocabulary skills were "impaired . . . , mainly due to difficult with abstract verbal reasoning." (*Id.* at 33-34.) Dr. Carnevale noted that when asked to define words, Respondent gave "concrete example[s]" and defined them "by using them in a sentence," and was "unable to provide an abstract response." (*Id.* at 34.)

Dr. Carnevale's professional opinion was that it was "unlikely that [Respondent] understood the meaning of 'arbitration' in 2020."[9] (*Id.* at 35.) Because Respondent did not understand the meaning of the word "ambitious" during testing, Dr. Carnevale opined that Respondent likely "lacked the cognitive reasoning ability to understand the meaning of the word 'arbitration' when he initialed this section in his employment application/agreement in 2020." (*Id.*)

---

[8] Dr. Carnevale indicates that he is a psychologist licensed in New Jersey. (ECF No. 45-1 at 30.)

[9] Dr. Carnevale's professional opinion was expressed "within a reasonable degree of neuropsychological certainty." (ECF No. 45-1 at 35.)

10

In Dr. Morgan's seven-page report,[10] solicited by Petitioner, Dr. Morgan noted that he completed a neuropsychological assessment of Respondent with the assistance of a board-certified psychometrist, which consisted of clinical interviews, record reviews, selected test administration, and case analysis. (*Id.* at 42-43.) Dr. Morgan reported that Respondent failed "two of the performance validity tests," which "indicate[d] that [Respondent] failed to provide normal appropriate effort on neuropsychological testing." (*Id.* at 43.) As result, Dr. Morgan opined that the "neuropsychological testing [was] unreliable and invalid and [did] not represent [Respondent's] actual abilities." (*Id.*) Dr. Morgan also reported that Respondent "endorsed more noncredible symptoms than credible symptoms of psychiatric distress," also supporting the finding that the testing was invalid. (*Id.*)

Nevertheless, Dr. Morgan noted that the cognitive testing he conducted showed "gross differences" from the testing reported by Dr. Carnevale. For example: Respondent scored in the 37th percentile on the WAIS-IV vocabulary test with Dr. Morgan but in the 16th percentile with Dr. Carnevale; Respondent completed Part A of the Trail Making test in 42 seconds with Dr. Morgan but 71 seconds with Dr. Carnevale; Respondent completed Part B of the Trail Making test in 89 seconds with Dr. Morgan but did not finish with Dr. Carnevale; Respondent scored at the 5th percentile of the Logical Memory-I test (WMS-IV) and 25th percentile on the Logical Memory-II test with Dr. Morgan but at the 1st and 5th percentiles, respectively, with Dr. Carnevale. (*Id.* at 43.) Dr. Morgan opined that these discrepancies on the same tests "make little sense and can only be attributed to the test-taking behavior of the examinee." (*Id.*)

---

[10] Dr. Morgan indicates that he is board certified in clinical neuropsychology with a subspecialty in pediatric neuropsychology from the American Board of Professional Psychology. (ECF No. 45-1 at 44.)

11

In Dr. Morgan's professional opinion, there was no "reliable, valid, and credible evidence of a documented learning disability or any significant cognitive impairment."[11] (*Id.* at 44.) Nor did Dr. Morgan find Respondent "credibly emotionally distressed." (*Id.*)

This new deposition and expert evidence, whether considered in isolation or in conjunction with the earlier evidence, does not satisfy Respondent's burden of proving by clear-and-convincing evidence that his mind was "so clouded" as to render him incompetent or that Respondent was incapable of understanding the effect of signing the arbitration agreement in October 2020.

There is not sufficient evidence for the Court to find that Respondent was incompetent or incapable of understanding the arbitration agreement. Respondent's position is undermined by the three-page, single-spaced, handwritten letter that Respondent submitted in March 2019 as part of a suit he filed in the Superior Court of New Jersey, Monmouth County, against one of his other former employers, Panera Bread.[12] *See Eric Sica v. Panera Bread*, Docket No. MON-L-000324-19 (Law Div.). In that letter, dated more than a year before Respondent signed Dollar General's arbitration agreement, Respondent swore that he was "capable of writing this certification," and he represented to the court that he did not remember seeing or signing the arbitration agreement that Panera Bread was trying to enforce. (ECF No. 43-2 at 2-3.) Respondent further represented that he would not have "understood what [he] was signing, unless there was a way for it to be explained in a way [he] could understand." (*Id.* at 3.) He then represented that he "only found out" about the arbitration agreement "because of [his] attorney" and that "[w]hen [his] attorney explained the terms of the arbitration agreement to [him], [Respondent] knew [he] did not accept

---

[11]   Dr. Morgan's professional opinion was expressed "within a reasonable degree of scientific neuropsychological certainty." (ECF No. 45-1 at 44.)

[12]   Respondent testified during his deposition that he had been involved in other litigation previously, including a lawsuit against Barnes and Nobles for a slip and fall as well as a personal injury against an individual who rear ended him. (ECF No. 45-1 at 62-63.)

these terms. No one from Panera explained . . . that the company wanted [him] to waive [his] rights to sue them in court." (*Id.* at 4.) Respondent concluded by saying that if he had known what an arbitration agreement entailed, he "would have asked an attorney or family members to review the agreement . . . because arbitration agreements limit legal rights." (*Id.*)

Thus, Respondent represented in a sworn document in March 2019 that he had been informed by an attorney that signing an arbitration agreement with an employer could limit his right to sue in court. And though Respondent now denies having understood what arbitration was when he signed the Dollar General arbitration agreement in October 2020,[13] Respondent confirmed during his deposition that he understood those portions of the agreement that advised him to read the document carefully and that it was an "important document that concerns legal rights." (ECF No. 45-1 at 100-01.) Respondent also confirmed that he "understood" the arbitration agreement's advice that he take his time and consult with an attorney if necessary, notwithstanding that he claimed that his understanding was "[n]ot 100 percent" because he felt rushed.[14] (*Id.* at 101-102.)

Although Dr. Carnevale opined that it was "unlikely" that Respondent understood what "the meaning of the word 'arbitration' was," Dr. Carnevale did not opine on Respondent's prior experience with arbitration in the Panera matter or the letter that Respondent wrote that certified that Respondent's former attorney had informed Respondent about the consequences of an arbitration agreement.[15] (ECF No. 45-1 at 30-34.) Similarly, Dr. Carnevale found that Respondent struggles with "abstract verbal reasoning," but Dr. Carnevale also found that Respondent did better

---

[13] Respondent also denied remembering anything related to arbitration in the Panera Bread litigation. (ECF No. 45-1 at 67-70.)

[14] Respondent testified that he spent more than an hour reviewing the onboarding documents from Dollar General. (ECF No. 45-1 at 93, 116.)

[15] Dr. Carnevale simply reported that he was informed by Respondent that "he had a discrimination case against Panera" and "won this case in court." (ECF No. 45-1 at 32.)

with "concrete example[s]" and when words are used in "a sentence." (*Id.* at 34.) It is notable, then, that Dr. Carnevale offered no opinion as to whether Respondent would have been able to discern what arbitration meant based on the two-page arbitration agreement, which included a concrete explanation of arbitration. (*See* ECF No. 45-1 at 24 ("Arbitration is a process by which a neutral professional called an arbitrator hears evidence and argument from both sides to a dispute and makes a final, binding decision. There is no judge or jury in arbitration; the arbitrator chosen by the parties makes the final decision on any Covered Claim and decides whether to award you or Dollar General any relief.").)

Dr. Morgan's report also casts serious doubt on the accuracy of the testing completed by Dr. Carnevale and the conclusions drawn therefrom. Dr. Morgan's opinion, based on the "gross differences" in testing, was that Respondent was not exerting the appropriate effort and may have been trying to manipulate the results. And Dr. Morgan ultimately found no valid and credible evidence of a significant cognitive impairment. (*Id.* at 43-44.)

Taken together and construed even in Respondent's favor, the Court does not find that the evidence is "so clear, direct, [or] weighty" that it establishes or could establish a "firm belief" or "clear conviction" that Respondent did not or could not comprehend the nature and effect of agreeing to arbitration with Dollar General. *Jackson-Billie*, 2020 WL 1983054, at *2 (first quoting *State v. Campbell*, 93 A.3d 416, 420 (N.J. Super. Ct. App. Div. 2014); and then quoting *Liberty Mut. Ins. Co.*, 892 A.2d at 1244). To the contrary, Respondent had recent prior experience with arbitration and seemingly was capable enough of understanding its import that he penned a certified letter to a court in March 2019 advancing arguments as to why he should not be compelled to participate in arbitration with a different employer. The Court is therefore unpersuaded that Respondent was incapable of understanding the two-page arbitration agreement that he then entered into with Dollar General in October 2020.

Indeed, the factual circumstances in which courts have set aside a contract under New Jersey law due to mental incompetency are distinguishable from those present here. For instance, in *Estate of Norman A. Helfant Litigation v. Clark Capital Management Group, Inc.*, the district court found that the executor of the estate lacked capacity to authorize the representation agreement due to "stroke effects" where there was "uncontradicted medical testimony that given the nature of . . . [the] stroke, [the executor] would not have the capacity to understand the ramifications of what he was doing . . . even if he appeared to be able to sign a document" and "would not have been able to determine whether it was in his best interest to execute a document." Civ. No. 00-1026, 2000 WL 1522857, at *8 (E.D. Pa. Oct. 13, 2000). Similarly, in *S.G. v. A.G.*, the New Jersey Appellate Division remanded where the trial court denied the motion to vacate "without any reference to the unrefuted" and "comprehensive twenty-six-page" psychiatric evaluation that "concluded that defendant's 'state of mind was inconsistent with making an informed, knowledgeable and voluntary consent.'" A-5394-18T2, 2021 WL 318266, at *5 (N.J. Super. Ct. App. Div. Feb. 1, 2021).

Here, in contrast, Respondent's evidence of mental incompetency is neither "uncontradicted" nor "unrefuted." Instead, there is substantial credible evidence that Respondent had the mental capacity to understand the nature and effect of entering into the arbitration agreement with Dollar General, including Dr. Morgan's expert report, Respondent's March 2019 certified letter in the Panera matter, as well as Respondent's own testimony confirming that he understood that the arbitration agreement was an important document that would affect his legal rights. The Court finds that this evidence and these factual circumstances are more akin to those cases where courts have denied applications to vacate due to alleged mental incapacity or incompetency. *See, e.g., Jackson-Billie*, 2020 WL 1983054, at *2 (finding that the plaintiffs failed to demonstrate a lack of mental capacity to arbitrate where the defendant's expert "analyzed daily

15

neurological assessments, a psychiatrist's evaluation, a physical therapist's notes, an occupational therapist's notes, a social services assessment, and a report of . . . mental status interview, and concluded—to a reasonable degree of medical certainty—that [the contracting party] had 'intact decision-making capacity'"); *M.W. v. C.W.*, A-3494-19, 2021 WL 1235135, at *5 (N.J. Super. Ct. App. Div. Apr. 1, 2021) (refusing to vacate final judgment of divorce where, among other things, "at the final hearing, the parties made a handwritten change to their [marital settlement agreement]—one that was beneficial to defendant," and "the judge questioned both parties regarding their willingness to be bound by the terms of the [settlement] on the record"); *Jennings*, 885 A.2d at 489 (refusing to set aside settlement agreement where the medical proofs suggested "[a]t the very most, . . . that [the contracting party] suffered anxiety and emotional trauma due to a longstanding mental condition, but nothing in that diagnosis suggest[ed] that [the contracting party], as a result, was unable to comprehend the nature and extent of his acts").

Accordingly, the Court will grant Petitioner's request to enforce the Dollar General Employee Arbitration Agreement and to compel to arbitration Plaintiff's claims arising from his employment at Dollar General. Although Petitioner initially asked the Court to stay the state-court action, the Court's review of the Superior Court of New Jersey's docket indicates that the state-court action was dismissed without prejudice in November 2022 pending the outcome of the present application to arbitrate. *See* Trans. ID LCV20224020625 in *Eric Sica v. Dollar General Corporation, et al.*, Docket No. OCN-L-000802-22 (Law Div.). The state-court action is listed as "closed." Accordingly, there appears to be nothing in state court for the Court to stay because there is no active case.[16] *See, e.g.*, *Jpmorgan Chase & Co. v. Custer*, Civ. No. 15-6288, 2016 WL

---

[16] The Court will stay this case, however, pending the outcome of arbitration. *See Smith v. Spizzirri*, __ S.Ct. __, 2024 WL 2193872, at *4 (U.S. May 16, 2024) ("Keeping the suit on the court's docket makes good sense in light of this potential ongoing role, and it avoids costs and

927339, at *7 (D.N.J. Mar. 10, 2016) ("Courts in the Third Circuit have found that an injunction of a pending state court action pending arbitration falls under the 'necessary in aid of its jurisdiction' exception, because the injunction is necessary to aid the court's exercise of its jurisdiction over the petition to compel arbitration.").

## IV.    CONCLUSION

For the reasons set forth above, and other good cause shown, the Petition to Compel Arbitration (ECF No. 3) is **GRANTED**. An appropriate Order follows.

Dated: May 31, 2024

*[signature]*

**GEORGETTE CASTNER**
**UNITED STATES DISTRICT JUDGE**

---

complications that might arise if a party were required to bring a new suit and pay a new filing fee to invoke the FAA's procedural protections.").